www.endodontics.com  Can I ask you a process question? Because these process questions just come up with increasing frequency when we're all learning about these PTAP proceedings. And one that your friend raises is that, I think, you relied on Kuhn for anticipation and not for obviousness, and the board rejected that when it instituted, but then went on to evaluate the claims in light of Kuhn as obvious. Did you see a procedural problem, particularly one with respect to adequate notice? So in terms of adequate notice, the problem identified of just not heat treating the entire shank was specifically argued and discussed by both the petitioner and the patent owner and addressed by the board. Regarding Kuhn and the Kuhn round, the board, and it was discussed in everyone's papers, this was not a new issue that was raised as GSI's counsel has proposed. Specifically, the board cited paragraphs from Dr. Goldberg that talked about Kuhn in combination with the other references that make up that ground as providing the motivation to heat treat the entire shank. In addition to noting Kuhn's disclosures, the board recognized that McSpadden and Pelton also described heat treating medical tools that include a nickel-titanium component. That's right in the decision. That's at the appendix on page 17. McSpadden, in particular, teaches heat treating a fully-formed endodontic file, which, of course, includes the entire nickel-titanium shank, in order to achieve a desired degree of super-elasticity and or to set a desired file shape, such as pre-curved, meaning when you bend it, it stays bent. That's the exact problem that Dr. Lupi stated was his invention, that you would heat treat a portion of the nickel-titanium file such that when you bend it, it stays bent. You heat treat it. You want to raise its shape recovery temperature to above body temperature, so when you're actually using this file, it's going to bend. It's not going to spring back. It's going to follow the root canal. To Judge Bryson's question of Mr. Lieberman, when you're using this file, that's a portion of the file. A portion of the file that's heat treated, as disclosed by Mazzutani and suggested by the references in the Kuhn ground, is the portion of the file that goes in the patient's tooth. It's achieving the very goals that Dr. Lupi says he invented, that Mr. Lieberman says Dr. Lupi invented. That's precisely the problem that Mr. Lieberman says, this was a cat's pajamas in the reply brief. He said everybody thought you wouldn't remove the super-elasticity. Well, the references that make up both the Mazzutani ground and the Kuhn ground make it clear that it was not Dr. Lupi's invention. He was not the one who thought of heat treating a nickel-titanium file, a portion of that file, so that you would remove the super-elasticity. That was well known in the prior article. That was known to Mazzutani, that was known to Kuhn, and in combination with the references that the board relied on. And that included Dr. Goldberg's testimony. Regarding the motivation to combine in both the Mazzutani and Kuhn grounds, the board specifically considered the evidence of record, including the testimony of Dr. Goldberg, in finding that it would have been obvious to modify and or combine the cited references to heat treat the entire shank, as opposed to just a portion. As mentioned, it's going to avoid, indisputably, it's going to avoid the difficulties and added expense of having these additional steps just to partially heat treat the file. And, Your Honors, with that, unless there's any additional questions, for the reasons discussed today and in U.S. Senate's briefs, it is U.S. Senate's position that the board's decision should be affirmed. Unless there's any further questions, that's all I have. Thank you.  I'd like to make four brief comments. The first addresses the question that you had asked, Chief Judge Crost, about procedure. With respect to at least the Kuhn ground, U.S. Senate never raised, in its briefs to the board, either of its briefs, an obvious to try or a finite number of alternatives argument. They did not make that argument. If you search their briefs, you won't find obvious to try. You won't find the words finite number of alternatives or anything like that. It is not in their briefs. This was an argument that the board raised on its own in a decision to which we did not have the opportunity to respond. Did you ask for reconsideration? We did not, Your Honor. Asking for reconsideration, as you know, with the board is... We didn't think, given all the errors in the board's decision, that that was the appropriate forum to address this. Because we saw at least four procedural errors, and we thought it would be better to bring those issues to this court. Did it come up in oral argument? Oh, it did come up in oral argument. But it did not come up in the briefs. It was not an argument made in the briefs at all. And it wasn't an argument made in the briefs at all because their only argument with respect to Kuhn was that Kuhn was an anticipatory reference. And when the board found that it wasn't anticipatory, the board had to cobble together. And I don't mean that in a derogatory fashion. They had to cobble together an obviousness argument. And they chose a logical path that had not been argued by U.S. Endo, and thus it wasn't one to which we had the opportunity to respond. Well, I don't understand, then, your answer to Judge Still's question about whether it came up in oral argument. Did it come up in a way that you got to respond? I mean, if it came up, it came up, right? So how did it come up? There were questions in oral argument about different ways of doing things. But questions aimed at you that you responded to? I don't remember to whom the questions were asked, but it doesn't matter. When something is raised only for the first time in oral argument, this Court, in the In Re Invasive case, has made very clear it's too late. It's waived. This Court has dealt many times, not just with that issue coming up in appeals for PTAB proceedings, but when parties raise arguments for the first time in oral argument in this Court. Now, this would affect, I take it, only the Kuhn ground and not the Matsutani ground for obviousness. Yes, there was a reference at page 4 to 5 of the reply brief with respect to the Matsutani ground. So the issue was, although only obliquely raised, it was raised with respect to Matsutani. I'm sorry, I missed... Are you saying that the argument you're just now making about the problem with Kuhn, that doesn't apply to Matsutani? That's correct. Okay. That's correct. The second point is with respect to Goldberg. Goldberg's Conclusory Declaration, let's put aside Conclusory for a second, only deals with the issue of expense and ease of use. Again, going back to the I-beam example, if a piece of prior art says, you shouldn't have an I-beam that's less than a certain width, because if you do, the building may fall down. And somebody says, but I can use a lighter I-beam, it's easier to get in and it's cheaper to buy. That doesn't deal with the issue. And that's what Matsutani was saying. You may have this lack of fixed rotational axis, which is going to cause this terrible problem with the tooth. And the response is, well, but it would be cheaper to heat the whole thing. Now, how did the board deal with that? The board never addressed that. And that's why this court's rulings were saying, you have to deal with reasonable expectation of success. They're so important. This court, in an opinion by Judge Lurie, last week, a Honeywell case, dealt with an almost identical situation, at the Slope Opinion at pages 11 and 12. They said that you have to deal with the reasonable expectation of success, and you cannot shift the burden to the patentee to show that a person of ordinary skill would have thought that the invention was unworkable. That's exactly what the panel did at pages 18 and 27 of the appendix. They shifted the burden. They said, GSI has not proven that it would be unworkable to do X. They've shifted the burden, and they never discussed the question of, what do you do with the Matsutani problem, and how do you weigh that against it's less expensive? Would a person of ordinary skill have said, okay, maybe it's not such a big risk. He used the word may. He didn't say it will. But if I can save 20%, the board didn't even talk about that issue. And that's absolutely critical. Also, Your Honor, and ask me questions about the specification, I'll give you two specification sites. Column six, lines 49 to 55, and column nine, lines 19 to 23, talk about the rationale for heat treating the file. I see my time is up. I have a concluding point, if the court would permit. A brief one. Brief one. On the issue of McSpadden, which Mr. Ginsburg mentioned, McSpadden reference is very clear, and this is appendix 2354, and 2365 to 66. All three of the embodiments of McSpadden are described as being stiffer. Stiffer, not more flexible, not less firm, and the abstract also says, the file is stiffer than comparable files fabricated from conventional Mai Tai. McSpadden is teaching away, just as Matsutani is. Thank you, Your Honors. We thank both sides. The case is submitted.